Nott, J.,
delivered tbe opinion of tbe court:
Tbis action is brought to recover tbe sum of $250,000, for tbe use in tbe Post Office Department of Norton’s patent right for tbe cancellation of postage stamps, and tbe postmarking of letters.
Tbe case presents some of the gravest questions of law, going to tbe jurisdiction of tbe court, to tbe powers of tbe Executive Departments, to tbe evidence, and to tbe measure of damages that have ever been brought before tbe court. It has also been three times elaborately argued: once upon demurrer, wbicb tbe court'with grave doubts overruled; again at tbe former trial, when four judges were equally divided; and *444 finally when, it was re-tried before a full bench. Yet it now goes off upon a single finding of fact.
The action is brought upon a contract whereof the claimants, in their amended petition, proffer this averment:
"Petitioners further state that in the month of March, 1863, or thereabouts, the Postmaster General, being desirous of using the said invention in his department, obtained the consent of petitioners thereto, cmd promised petitioners to pay for such use its fair cmd reasonable value; and thereupon, with the consent and agreement of petitioners that the government should be permitted to use such invention, the said Postmaster General adopted the said invention into use, and has constantly used such invention in his said department from the first day of April, A. D. 1863, until the present time. Petitioners further state, that such agreement has been, at different and various times since such date, repeated by the said Postmaster General cmd Ms successors in office, upon and for the consideration that petitioners would permit the government to use the same, and not embarrass or prevent its use as aforesaid by legal proceedings.”
This court finds as a matter of fact that no such contract was ever entered into by the claimants and the defendants, but that, on the contrary, it was expressly agreed between the claimants •and the agents of the defendants that the Postmaster General had no authority to purchase the patent right or its use; and that the claimants were to allow its use in the postal service so long as they, the claimants, saw fit, leaving the matter of remuneration exclusively to the will and action of Congress.
The evidence upon which this finding rests is the testimony of the three Postmasters General, under whom the invention has been used. The first, Postmaster General Blair, says:
"There was no contract with these parties, or with anybody else, entered into by me, by which the department was engaged to pay them, or pay anybody else for the use of the patent right in the instrument. On the contrary, when an objection was made, either at that time or subsequently to the use of the instrument furnished by the contractors, on the claim that they did not own the patent right, my reply was that such claims must take the ordinary course of law, and proceedings must be instituted against those who were making the instruments and selling them to ns, and the rights settled by the courts in that form of action; that I would not undertake to decide whether *445 anybody’s patent was invaded by any parties wbo were selling the department stamps or locks, or any instrument that we were called on to use in the course of our business.”
And upon his cross-examination, he was asked: “Was not the result of your negotiations or talk with the owners of this patent that they should not interfere with the manufacture of stamps by the contractor, and should look to the government for compensation, provided they first established their claim to the patent by suit at law ? ”
And he answered: “ My recollection is that I declined altogether to interfere between the contractor and the claimant to the patent, and contemplated no responsibility on the part of the government to any one, save the contractor, for the use of the instrument, in any event.
“ I do not recollect whom my talk was with. I have no recollection of ever seeing Mr. Norton; all that I recollect was that such a claim was made about the time of making this contract, and that I was explicit in taking the ground above stated in reference to it.”
The second, Postmaster General Dennison, in his testimony, says: “My attention being called to an alleged conversation between myself, as Postmaster General, and Mr. Marcus P. Norton, set forth on page 4 of claimant’s testimony in this case, I have to say that I cannot recall specifically any conversation with Mr. Norton on this subject; but do remember of having one or more conversations with some person or persons representing the 'Norton patent.’ The conversation, as stated by Mr. Norton, I do not think ever could have taken place in the form or to the effect of his statements. I have no recollection, and don’t think it possible from my habits, of saying anything or intending to say anything to impose any obligation on the Post Office Department, or on the part of the government to pay anything for the use of the stamps beyond or outside of the then existing agreement between the department and Fairbanks & Co. It is not improbable, but quite probable, that I expressed a hope that Congress would treat Mr. Norton, or his assignees, liberally for the invention, and I so expressed myself in effect in my letters to the Committee on Post Offices and Post Eoads of the Senate, as hereinbefore referred to.”
And upon his cross-examination, he adds: “ I cannot say, *446 therefore, whether in any conversation with Mr. Norton, or his assignee, he complained of the delay of Congress in acting upon his petition or claim, but I have little doubt that complaint in some form was made to me, but I have no recollection of saying or intending to say anything to quiet the complaints by holding out to Mr. Norton, or his assignee, any consideration therefor. I regarded the whole subject of the patent as practically in the hands of Congress, I, as Postmaster General, having no authority to treat on the subject, or to say or do anything except in pursuance of the contract already referred to, made between my predecessor, Montgomery Blair, and Fairbanks & Co.”
“ So far as my official action related to the Post Office Department proper, I had no purpose of changing in any way the existing contract with Fairbanks & Co. during the term of the contract; but, as officially related to Congress, I was prepared to suggest, and did suggest the purchase of the patent by Congress, and a full settlement with Mr. Norton, or his assignee, of all matters relating thereto.”
The third, Postmaster General Bandall, also sworn as a witness in the case, testifies:
“ I said there was no money under my control appropriated for the purpose to pay him either for the patent or for its use, and that I could not make any distinct arrangement with him about it, as our contract was only with the party who furnished the stamps; that I had no authority to make any arrangement with him about it. I told him that while he could interfere with the contractor, and so embarrass the department, that I hoped he would not do it; that I had no doubt Congress, under proper representations, would pay him for the use of his stamps. I told him I woidd myself urge it upon the committees that the stamp had been of great use to the department; had been a great saving, and that the department could not get along without the use of it, without incurring great additional expenses ; that Congress ought to make a liberal appropriation for the use of that patent, and I would do everything in my power to aid him in getting compensation in that way. That is the substance of the several conversations with him on that point.”
"By the Solicitor for the United States:
“Question. I now call your attention to the testimony of Marcus P. Norton, page 4 of claimant’s testimony, and to the following clause: That if the complainants would permit the *447 continued manufacture of tbe stamps for tbe government, tbe government would pay for tbe use of tbe invention and improvement a fair, just, and liberal compensation.’ Please state whether you ever made such an agreement.
"Answer. I never made any agreement at all. I said that I hoped be would not interfere with tbe manufacture of these stamps; that I bad no doubt tbe government would mate to him liberal compensation for tbe use- of it, and that I would urge tbe same upon tbe committees, and presumed that be would be compensated.”
Against this most clear and positive testimony there is nothing brought except a slightly different version of tbe conversa-' tions given by Assistant Postmaster General Skinner, who uses tbe word “ government” for tbe word “ Congress,” and tbe somewhat colored, though unintentionally colored, statement of tbe inventor, who was acting as tbe agent of tbe claimants. Tbe weight of evidence seems to us overpoweringly in favor of tbe defendants, and tbe case to be simply that of an agent who at tbe request of an, inventor has tried and used an invention subject to tbe ratification of bis principal, who, in this case, is Congress.
It may be added, for tbe better understanding of this evidence, that tbe stamps used by tbe Post Office Department were manufactured chiefly by Messrs. Fairbanks & Co., of New York, a large and well-known manufacturing bouse, under a contract bearing date tbe 18th of April, 18C3, which contract was founded upon, and expressly included as a part of itself, this proposal:
“ In accordance with tbe inclosed advertisement, we propose to furnish for tbe use of tbe post offices of tbe United States, for four years from first of April next, marking stamps with Norton’s attachment for canceling the postage stamps at the same time the marlcing stamp is applied, letters patent for which home been issued, and wlvich patent is excUisively wider our control.”
Tbe judgment of tbe court is that tbe petition be dismissed.
Casey, Cb. J., and Peck, J., dissented on tbe facts.