Nott, J.,
dissenting:
In JRoberts’s Case (11 O. Cls. B., 98), the agreement was that, the claimants’ services should be rendered subject to the ratification of Congress, and that they should not be a matter of expense to the Post-Office Department. In this case the contract in like manner provided that the claimants’ lease should be subject to the ratification of Congress, and Avith like effect that no payment of rent should be made until Congress provided the means. In Boberts’s Case, Congress never in terms ratified the transaction, but the Supreme .Court held that the reference of the claim to this court by Congress, inasmuch as the claimant should reeoA’er ex ceguo et bono, Avas in effect a ratification. In this case, Congress have not in express Avoids ratified the lease, and if there had been no express legislative action in regard to it, unquestionably the claimant’s case would come under the rule laid doAvn by this court in Shavor & Corse (4 C. Cls. R., 440), where it was said, under similar conditions, that, Congress not haAÚng ratified the transaction, no legal liability arises and no action lies; or, under the rule laid down by the Queen’s Bench in Churchward v. The Queen (1 L. R., Q. B., 173), where it was held that if certain commissioners did not make themselves, nor their department, nor the OroAvn answerable, but left it to Parliament to find the funds, and Parliament “not merely omitted to find a fund applicable to this purpose,” but in two successive appropriation acts “ cautiously provided for the ex- *178 elusion ” of the claim from general appropriations, there no liability would arise on the contract.
The case therefore depends upon the express or implied ratification of Congress — upon the legislature having done what they neglected to do in the Shavor & Corse Case, and what they refused to do in the Churchward Case. What, then, was the action of Congress in regard to this lease 1
The Government had entered into the occupation and enjoyment of the claimants’ premises on the Gth June, 1873, and were in the continued occupation and enjoyment of them when, at the next session of Congress (June 20 and 22,1874), two distinct appropriations were made for the rent of the first and second years of the term. The appropriation for the first year was not, in general terms, for such buildings as the Postmaster-General might have rented, but for these specific premises, designating .them by the street and number, and defining the purpose for which they were rented. Neither was it for a greater or less amount; but, on the contrary, it designated the precise amount named in the lease. Attached to the appropriation was a provision that thereafter no building should bo rented in Washington for the use of the Government “ until an appropriation therefor shall have been made in terms by Congress.” I do not attach much importance to this provision, but if it has any significance in this case, it is that of a legislative declaration that the heads of the executive departments theretofore had had authority to rent buildings for public purposes, and thereafter the power should be taken away.
At substantially the same time that this deficiency bill was passed (June 22,1874), there was also passed (June 20,1874) ,the appropriation act for the ensuing fiscal year, and by that act Congress again appropriated the precise rent of the premises for the second year of the lease. In both statutes the appropriation is declared to be “for rent,” and for the rent of these specific premises.
Now, it is a familiar principle that the existence of an express negatives the supposition of an implied contract. The Supreme Court, indeed, has felt bound to apply this principle even where it worked much hardship and injustice to an innocent party. Gibbons’s and Carpenter’s Cases (7 C. Cls. R.., 405; 9 id., 18). When Congress appropriated money for the "rent” of these premises and for the precise rent designated in the written lease *179 under which the Government had entered into possession, can it be doubtful either as law or as fact that the rent intended was the rent expressly agreed upon ?
Again, it is a familiar principle, where a contract is made by an agent subject to the ratification of his principal, that the principal must either ratify or reject it, and that he can neither ratify it in part, nor alter it, nor amend it, nor attach conditions to it, nor in any way make a new contract out of it. Whitesides Case (12 C. Cls. R., 10). Now, in this case the lease was for a definite term of three years, and the ratification of the principal could not have been given for any diminished time. Congress, if they gave any ratification whatever to the instrument, ratified it for the full and entire term which it prescribed. It is impossible to hold upon legal principles that there was a ratification pro tanto for one year and another ratification pro tanto for the second year, and that the lease fell for the third year because a thirdpro tanto ratification was not given. It is equally without legal principle to say that the transaction required three ratifications. There was but one lease and but one term; that term was an entirety; Congress, as the principal in the transaction, could ratify or reject; but a ratification once given was operative for the whole term, and had no more legal efficacy for the first third part of the term than for the last.
The Supreme Court said in the Boberts Case, “ If this were a controversy between private parties, we do not think that there could be a particle of doubt that the contractor would be entitled to demand compensation.’7 Much more truly in this case may that remark be repeated. Here the agreement does not float through prolonged correspondence, but is condensed into a formal written instrument. Here the valuable consideration given by the claimant was not a thing of the past at the time when the ratifying statute was enacted, but was still largely in futuro, enabling Congress to reject the agreement of their agent without doing grievous wrong to the other contracting party. Here the ratifying statute did not come as a mere act of grace after the service had been voluntarily rendered, but came in the first year of the term and as a legal inducement for the landlord to leave the Government in undisturbed enjoyment of the premises. Here the ratifying act is not couched in ambiguous language susceptible of two interpretations, but unequivocally refers to the premises and to the use of them and to the rent *180 specified in the lease, and, moreover, is intensified by the fa et of payment being expressly authorized. In short, if the language used by Congress and the payments made by authority of Congress do not together constitute a ratification at law, then it is an idle task to apply established legal principles to public contracts, and the reasoning of the Supreme Court in the Roberts Case must be set down as fallacious.
If, then, Congress ratified the transaction of the Postmaster-General and authorized the Government to accept the benefits of his agreement, is there anything in the lease which makes the landlord’s right to recover his rent contingent upon the subsequent action of his tenants ? Assuredly it would be a monstrous paradox to hold that a man leased his premises by a valid agreement for a rent certain and a term certain, with a condition, nevertheless, by implication or construction, that the rent should be no more than the tenant chose to pay, and the term should cease whenever the tenant chose to put an end to it. The language of the agreement is “that this lease is made subject to an appropriation by Congress for the payment of the rental herein stipulated for, and that no payment shall be made to said party of the first part on account of such rental until such an appropriation shall be available.” If the Postmaster-General had been the principal in the transaction, and Congress a third party, having no direct or beneficial interest in the lease, there would be reason for taking this language in its literal sense and construing it as a condition-precedent to the Postmaster-General’s liability for the rent. It would then be the case of a man whose agreement to pay the rent of a building was expressly conditioned upon the happening of some event over which he had no control, and as to which he was not bound to do anything to bring it about. But here the Postmaster-General was not the principal, and the occupancy of the building was not by him, but by the defendants, that is, the Government, under the authority of Congress; and the case is really that of an agent who, having entered into an agreement in his own name, for the use of his principal, inserts a jnovision that he shall not be required to pay the rent until he receives funds for that purpose from the party who is to have the real use of and occupation in the premises. If a contrary construction be given to this clause, and it be construed to limit the principal’s liability, then clearly two results will follow, each abhorrent to *181 tbe terms and conditions of tbe lease, and in conflict with tbe well-settled rules of construction that govern tbe relations of landlord and tenant; wbicb results are these: First, that the clause will change tbe rent certain expressly reserved as tbe consideration and condition of tbe lease to an uncertain amount, arbitrarily within the control of tbe other contracting party; second, that tbe tenancy for a term of years expressly defined in tbe lease will be changed into a tenancy for no term certain, but literally at tbe will of tbe tenant. Manifestly, such a construction would rob this written lease of tbe characteristics wbicb make written instruments valuable in defining and rendering certain tbe agreements and transactions of men. Manifestly, such is not tbe construction wbicb a court should give to any instrument. It would be making a minor part greater than tbe whole, and allowing oue party at bis option to destroy tbe expressed consideration for tbe agreement, and, indeed, reduce it at bis pleasure to a nudum pactum. Clearly, I think, tbe object of tbe Postmaster-General in inserting this provision in tbe lease was simply that of former Postmasters-General, in Shaver & Oorse and tbe Roberts Gases (cited supra), to declare that tbe consideration should not be payable out of tbe ordinary revenues of or general appropriations for bis department. It amounted to nothing more at tbe most than a covenant on tbe part of tbe landlord that be would not seek payment from tbe Postmaster-General out of tbe ordinary postal revenues in bis bands. But it would wholly annul tbe purpose, and conditions, and express language of tbe lease to turn this clause into a covenant that tbe landlord should seek no more rent for tbe use and occupation of bis premises than tbe Other party might choose to give him.
To render transparent tbe fallacy of that defense, let us turn tbe case around and apply to the transaction tbe test of mutuality. If tbe action of Congress, within tbe intent of tbe parties when they made tbe contract, did not amount, to a ratification of tbe lease binding upon tbe ten ants, assuredly it did not amount to a ratification binding upon tbe landlord. An agreement wbicb binds one party to everything and tbe other to nothing is no agreement in law. Let it be supposed that after Congress bad passed tbe deficiency act 22d June, 1874, providing for tbe rent of tbe current year of tbe lease, and tbe appropriation act 20th June, 1874, providing for tbe prospective rent of tbe second *182 year of the lease, the landlord, finding he could lease his building to a third party on better terms, had come into a court and sought to eject the occupants on the ground that Congress had not then made an appropriation for the third year of the lease. Can there be a doubt that the court would have said to him u Congress have recognized your lease and accepted it; they have provided for the payment of the precise rent reserved by the lease et in prcesenU et in futuro; appropriations according to the well-known system and practice of Congress are made from year to year, and do not extend beyond the ensuing fiscal year; Congress have done everything for you that it is usual for them to do for the President in regard to his salary, or for contractors upon the public works whose services extend through a series of years, or for any of the continuing creditors of the Government ; you knew of this usage when you made your contract, and for you to allege now that you supposed Congress would depart from well-considered precedent and appropriate for your rent in advance of appropriations for all other creditors of the Government is preposterous. Your lease has been accepted by Congress; acceptance is at law a ratification; the lease now binds the Government and it binds you; you must abide by it. The condition in your lease that rent shall not be paid till money be appropriated to pay it is nothing more than the unwritten condition which the law attaches to all public contracts.”
Finally, we may infer that there was need of such a clause in this lease, from the fact that the Post Office is an exception to the great Treasury system of the United States, inasmuch as, on the one hand, it collects and disburses immense revenues irrespective of appropriations by Congress, and on the other its disbursements are not under that general supervision which gathers up, sooner or later, all other accounts and disbursements and subjects them to the rigorous test of being allowed or disallowed by the Comptrollers of the Treasury. The Postmaster-General, unlike the heads of all other executive departments, is his own comptroller. Undoubtedly he is bound to make no payments except in pursuance of law, like other disbursing and administrative officers; but still it is within his power, unlike other disbursing and administrative officers, to pay claims upon his department, and then pass upon the validity of both the account and the payment. If the Sixth Auditor rejects a claim on the Post Office, the Postmaster-General, like a Comptroller *183 of tbe Treasury, can. overrule tbe decision and cbrect payment of tbe claim. It was, therefore, eminently proper for him to malee tbe payment of this rent, so far as bis official duty was to be concerned, dependent upon tbe specific appropriations of Congress; and tbe propriety of bis doing so only renders it clearer that tbe clause in question was intended to regulate bis administrative action, and that tbe covenants which fixed tbe tenure of tbe lease and tbe rent to be paid were intended to define tbe legal rights of tbe parties. It is with tbe legal rights of parties that courts must deal. I am, therefore, of tbe opinion that tbe lease is valid, and that tbe claimant should recover upon it $4,200. Tbe judgment now rendered, as I understand it, is not upon tbe lease, but upon tbe act of Congress, which appropriates $1,800 for rent, but prescribes that “tbe above sum shall not be deemed to be paid on account of any lease for years of said building.” (Act 3d March, 1875, 18 Stat. L., 367.)