Rule must be made absolute.

## Case No. 2,361.

### CAMPBELL v. JAMES et al.

[17 Blatchf. 42; 4 Ban. & A. 456; 18 O. G. 979; 8 Reporter, 455.] [1]

Circuit Court, S. D. New York. Aug. 14, 1879. [2]

PATENTS—POST OFFICE HAND-STAMPS — VALIDITY — INFRINGEMENT BY GOVERNMENT OFFICER — EVIDENCE OF PRIOR INVENTION — ASSIGNMENT.

1. The re-issued letters patent, division A, No. 4,143, granted to Helen M. Ingalls, October 4th, 1870, for an improvement in post-office postmarking and cancelling hand-stamps, (originally granted to Marcus P. Norton, April 14th, 1863, and re-issued to Jacob Shavor and Albert C. Corse, August 23d, 1864, and to said Norton, August 3d, 1869), are valid.

[See note at end of case.]

2. The invention was made by Norton before May 4th, 1859. A letter from Norton, introduced in evidence by the defendant, is evidence for the plaintiff on those points which are in his favor. Evidence to defeat a patent, on the ground of prior invention, ought to be such as to remove all fair and reasonable doubt.

3. The assignment on which a re-issue was based was alleged to have been forged by the assignee, but, it appearing that the assignor, after the re-issue, recognized the assignment as valid, it was upheld.

4. The execution of an assignment by a corporation and by S., president, held to be a good execution by S. for his individual interest.

5. An assignment of a patent to an assignee in trust, gives him the legal title.

[Cited in Jonathan Mills Manuf'g Co. v. Whitehurst. 56 Fed. 594.]

6. Although the defendant used the invention as an officer of the government, in the performance of his duties, for the benefit of the government, he is liable as an infringer.

[Cited in Head v. Porter, 48 Fed. 487.]

[In equity. Bill by Christopher C. Campbell against Thomas L. James, Charles Eddy, Horace T. Caswell, and Samuel R. Clexton.]

Marcus P. Norton and George H. Williams, for plaintiff.

Stewart L. Woodford, Dist. Atty., and Samuel B. Clarke, Asst. Dist. Atty., for defendant James.

WHEELER, District Judge. This suit is brought for relief against alleged infringements of letters patent [No. 38,175] for an improvement in post-office postmarking and cancelling hand-stamps, originally granted to Marcus P. Norton, on the 14th day of April, 1863, and re-issued to Jacob Shavor and Albert C. Corse, on the 23d day of August, 1864, to Marcus P. Norton, on the 3d day of August, 1869, and to Helen M. Ingalls, on the 4th day of October, 1870, in division A, numbered 4,143. The principal defences set up and relied upon are, that Norton was not the first inventor; that there was no patentable invention involved; that it was in public use more than two years before the application, and with his consent and allowance; that the re-issue in suit was not for the same invention; that the plaintiff has no title; that the defendant is a public officer; and that he does not infringe in fact.

There is much controversy as to when, in fact, Norton first produced this invention. The application was made January 5th, 1863, but that is not early enough to anticipate knowledge and use of the invention by others; therefore, it rests upon the complainant to establish prior invention by Norton. It clearly and satisfactorily appears, from all the evidence, that he produced it before May 4th, 1859. By letter dated that day, Horatio King, first assistant postmaster-general, authorized the postmaster at Troy, New York, to use, for postmarking letters at that office, for the term of three months, one of Norton's improved stamps. Norton was an inventor of other improvements in such stamps, and there is a question as to whether the stamp referred to in that letter was this one, or some other. King's testimony and correspondence settle it that this is the one. After he went out of office, he was employed by Shavor and Corse to assist them about obtaining compensation for the use of this stamp, and was kept familiar with it all the while; and his testimony is that this is the one. General Dix was appointed postmaster at New York early in 1860. In August of that year, he wrote to King about a similar contrivance which he had got up, and, in a reply, directed by King, was warned that there was a prior invention which might subject that office to a heavy charge, if his contrivance was used. This enables King to testify with positiveness that entitles it to credit, that he had correspondence with Norton about this stamp before that time. One form of this instrument had a canceller made of cork. Norton permitted it to be used at the New York office, to test it. Its use commenced there soon after the correspondence of Dix with the department in 1860, and was found there when Abraham Wakeman became postmaster there in 1861, or thereabouts, as is shown by his letter to the third assistant postmaster-general, dated January 3d, 1863. This correspondence, which does not depend upon mere memory for dates and circumstances, identifies this stamp very clearly. The complainant claims that the in-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission. 8 Reporter, 455, contains only a partial report.]

[2] [Reversed in James v. Campbell, 104 U. S. 356.]

vention was made in 1853 or 1854, and described in an additional description of a caveat filed about August 7th, 1854. This additional description, produced from the caveat files, does not appear to have ever been officially filed under the hand of any custodian of the records, and is admitted to be a copy made in 1868,[3] said to have been put into the files by mistake, in place of the original, which is not produced. The defendant has put in evidence the record of proceedings by the commissioner of patents disbarring Norton, as solicitor of patents, and adjudging that copy to be no part of the files; and claims that this destroys the effect of it as evidence. No evidence on which the commissioner acted, nor any showing the misconduct of Norton, is produced. Norton testifies that the original was duly filed, and afterwards copied, and the copy returned to the files, by mistake, as he supposes. The plaintiff claims that the action of the commissioner legitimately shows nothing on this question, and that Norton's testimony is all the evidence there is properly bearing upon the subject. The defendant has introduced a letter from Norton to Wakeman, postmaster at New York, dated February 6th, 1864, when Norton was interested in this patent as part owner, stating, that "the double cancelling stamp now used by you in your post-office, is my invention as far back as the year A. D. 1856, as I can most fully and satisfactorily prove. It was patented to me in the early part of the year 1863, upon an application made by me a long time before then. I had several such stamps made in 1858, as I can prove by the person who made them," for the purpose of impeaching the testimony of Norton as to the caveat. The caveat, as such, long before the application for the patent, ceased to be operative, because not followed up. The only use the copy found can be is as a piece of evidence. The judgment of the commissioner, as such, extended only to the exclusion of Norton as solicitor, and not to the effect of the paper as evidence en pais (Act July 8. 1870. § 17; 18 Stat. 200; Rev. St. U. S. § 487), although its effect upon the instrument as a caveat of record might be greater (Robertson v. Secombe Manuf'g Co. [Case No. 11,928]). What the weight of the evidence produced, and legitimately bearing upon the question, as to whether there was in fact an original paper of which the one now in the files is a copy, is not now considered. because it does not appear to be material. This letter of Norton's and its connection is stated, however, because, in connection with the evidence before stated, as to when he actually produced the patented article, it does appear to be somewhat material. It was introduced by the defendant as evidence. The part relied upon was that inconsistent with what Norton and the plaintiff now claim. But, when so put in, it was le-

gitimate evidence, according to what should appear to be its just weight, as well as to those parts in favor of, as to those against him. This is a well settled rule in respect to evidence of admissions. Stead v. Heaton, 4 Term R. 669; Davies v. Humphreys, 6 Mees. & W. 153; 1 Greenl. Ev. § 201; Wright v. Williams, 47 Vt. 222. The letter tends to show that Norton actually had such stamps made in 1858. It was written before there was any controversy as to this fact, and is strongly corroborative of the correctness of the finding, that the invented and patented instrument was brought forward before May 4th, 1859.

The defendant has introduced evidence tending to show that what is claimed to be the same invention was made by various other persons, and put into use at several post-offices, prior to that date even. The most prominent are at the Philadelphia office, by William M. Ireland, in 1851; at the New York office, by James J. Riley, in 1852; at the Cleveland office, by Charles E. Wheeler, in 1853; and, of these, that at the Cleveland office seems to be most confidently relied upon. If the question in respect to use at this office was to be determined upon a fair balance of proof, and upon the parol evidence alone, the balance might turn in the defendant's favor. But, the evidence to defeat the patent, by showing an invention prior to a clearly established one of the patentee, ought to be as clearly established, to the extent, at least, of removing all fair and reasonable doubts. There is, in the case, important written evidence upon this point, and the whole is to be weighed together. Wheeler himself, on the 28th day of November, 1863, wrote to A. N. Zevely, assistant postmaster-general, that he made the invention about the 1st of July, 1861, and that an order from the department, then issued, led to it. On the 7th day of May, 1864, E. Cowles, postmaster at Cleveland, by whom Wheeler was employed, at his instance, wrote to the postmaster-general, that the invention was made immediately upon the receipt of an order issued by Postmaster-General Holt. That order was issued at about the time of the invention stated by Wheeler in the letter, and could not have been issued long before. These deliberate statements made by two persons separately, and at so near the time of the transaction in question, and giving circumstances accompanying it, which, in fact, existed as they stated, and made with a claim of first invention which would interest them to state that the invention was made as early as the facts would warrant, and made in writings now produced, far outweigh, in reliability, statements made wholly from memory, fifteen years later and further from the transaction. Taking the whole into account, the defendant has not shown, by the requisite measure of proof, that Wheeler invented what he did before Norton did what he did.

---

[3] [18 O. G. 979, gives 1864.]

The direct testimony as to what Riley invented is contradictory and unsatisfactory. Riley testifies that the instrument which he invented was made by Mr. Hoole, who is understood to be the manufacturer of stamps for the New York office. Hoole was sued by Shavor and Corse for infringing this patent, pleaded to the action, and a trial, verdict, and judgment against him were had. He did not show this invention of Riley, which, according to Riley, he must have known of, in that defence. This goes strongly to show that Riley's statements are not correct. Ireland was a boy fifteen years old, in the Philadelphia office, in 1851. He was also there in the same employment in 1861. He doubtless did do in 1861 what he says he did in 1851. At this distance of time he may have carried back in his mind what he did, with the associations of 1861, to the same associations existing in 1851. When he made it in 1861 he remarked to others that it was his, without stating that he had made it previously. It is manifestly difficult to distinguish occasions in memory after so great a lapse of time. Prior to 1860 there was nothing to call the attention of those employed in post-offices imperatively to the necessity of such an invention, while in the latter part of that year the strict requirements of the department about cancelling postage stamps separately, and the increased use of the mails consequent upon the war in 1861, brought the subject sharply up. This brought out contrivances for the same purpose in post-offices in various parts of the country, and more probably gave rise to those particularly mentioned, as well as to others about which evidence was given, but which have not been particularly discussed here.

There is another consideration bearing upon this branch of the case, which is, that none of the things produced by these persons, if they produced what they say they did, were the same as this patented invention; nor were any of them the equivalent of it in all material respects. The discovery was, not that letters could be postmarked, and the postage stamps cancelled, at one blow; and, if it had been, that mere idea would not have been patentable; and, if that had been patentable to the first discoverer, it would have been anticipated by two prior patents, one of August 9th, 1859, and the other of December 16th, 1862, issued to Norton. But the patent is for a machine or instrument that will do both of these things at one blow; and the question would be, whether the other machines were like it. In this, the two faces which make impressions are connected by a cross-bar fixed in the middle to a brad-awl handle, on which both are balanced, so that a blow with it will bring both faces to the surface to be stamped, although not aimed so as to strike precisely perpendicularly. In those, a cancelling face was added to the side of the stamp made to be used alone, with the handle all upon that, and nothing to bring the other face down, unless the blow should be so aimed as to bring it to its place. This difference is shown by the evidence to be, as it is plain it would be, quite material. The stamp of the patent of August 9th, 1859, was, in form, open to that objection, as well as to the objection that its canceller was a cutter, which made it undesirable. In the patent of December 16th, 1862, the postmarking and cancelling faces were balanced upon the handle, like those of the patent in suit, but the canceller there was a cutter and the instrument could not be safely used. The invention in controversy combined the advantages of a safe and effective canceller, well balanced on the same handle with the postmarker, for the first time. The nearest invention to this is Berri's English patent of April 24th, 1860, sealed September 27th, 1860. That seems to embody all the material parts of this one, but was subsequent to it. The patent of Ezra Miller, dated March 22d, 1859, had the acting faces of the stamps balanced in the same way as this, but the handle was like that of a hammer, and the instrument, as a whole, quite different from this.

Upon the whole case it appears that, in fact and in law, Norton was the original and first inventor of this patented invention. That its production did involve the exercise of inventive faculties and skill is apparent from the various steps, trials, and tests by which it was reached, from the fact that so many other patents have been granted upon attempts approaching the same object, without accomplishing it, and from the fact that the patent has sustained a suit for infringement of it against a party using the invention in fulfillment of a government contract.

This patent was granted while the act of 1836 and that of 1839, in respect to the defence of public use and sale of the invention, were in force. By the provisions of the act of July 4th, 1836, § 15 (5 Stat. 123), it was only public use, or being on sale, with the consent and allowance of the patentee, before the application for a patent, that would defeat the patent. The 7th section of the act of March 3d, 1839 (5 Stat. 354), did not change the character of the public use or being on sale that would defeat a patent, but provided that no patent should be held invalid by reason of them, unless "such purchase, sale, or prior use, has been for more than two years prior to such application for a patent." Andrews v. Carman [Case No. 371]; Elizabeth v. American Nicholson Pavement Co., 97 U. S. 126. No use shown, except that at the New York office, was with the knowledge, even, of the patentee. The application was filed January 5th, 1863, so that a sale or use, to defeat the patent, must have been prior to January 5th, 1861, while General Dix was postmaster there. It is not very clear, upon the evidence, that this invention actually got into use there before that time; and this defence, like others of the same class, ought to be made out by clear proof. But, whether it was so in use

before that time or not, it is quite clear, from all the circumstances attending the use, whenever it was had, that it was not a public use, within the meaning of the statute, but a private use for testing the invention and informing the inventor as to its perfection and usefulness, with the design, on his part, all the while, to procure a patent for it, if it should prove to be ripe for that purpose. Elizabeth v. American Nicholson Pavement Co., 97 U. S. 126. The correspondence between the inventor and the postmasters, and between them and the postoffice department, abundantly shows this.

If the re-issues are for any other or substantially any different invention from that described in the original, they are unquestionably void. That the specifications or claims of the patent are different, the invention or discovery remaining the same, is of no consequence. The very object of the re-issue is to correct the patent, so as to make it conform to the invention. The principal objection to these re-issues is the specification of a metal canceller in the combination, as well as cancellers of wood or other elastic material. If a metal canceller had not been mentioned nor alluded to, it might well be said that it did not enter into nor form any part of the conceptions of the inventor; but it was mentioned in the original. It was mentioned as not being so useful or desirable in the combination as an elastic one, but, nevertheless, it was mentioned, as forming a part of an arrangement not patented or desired. The inventor or owner, when the re-issues were applied for, desired it, the invention comprehended it, and the patent was made to cover it. The original patent also mentioned a canceller of any suitable material, as a part of the combination.

It is said, that the title to the re-issue fails because Norton did not own the patent when it was surrendered by and re-issued to him on the 3d day of August, 1869. This fact is sought to be made out by showing that the instrument of re-assignment from Shavor and Corse to him was forged by him, by placing it before and attaching it to the genuine execution by them of another and different instrument, unknown to them. Much testimony and argument have been bestowed upon that question. Whether the instrument was so constructed, or was genuine, it afterwards came to the knowledge of Shavor and Corse, and they settled all their claims to the patent with those persons claiming title to it by virtue of that instrument, upon the basis that the instrument should stand as if valid. This ratified and confirmed it as to them, as good from the beginning, upon just and well-settled principles. But this was not done until after the re-issue, and it is argued that the title at the time of the re-issue had not become Norton's, and that the patent office had no jurisdiction to re-issue it to him, and that the plaintiff cannot now be allowed to show title in that way, because he has alleged title by force of the instrument itself, and not by ratification of it. It is, doubtless, true, that a re-issue of a patent to a person not the owner would not affect the title of the owner. The re-issue and title should go together, to make a good title to the re-issue, or, at least, the re-issue should be consented to by the true owner. Here, the title followed the re-issue, and became the same as if it had preceded it, and was consented to by the true owner, whether Shavor and Corse or Norton. This would seem to make the title to the re-issue good to Norton, in any event. Potter v. Holland [Case No. 11,329]. This makes is unnecessary to determine that question of fact, which involves a charge of the commission of a high crime, that cannot be well tried in this collateral way, without danger of doing injustice.

As the instrument became as if good from the beginning, it was well set up and alleged as good, without stating what made it so. Norton conveyed this and other patents to Helen M. Ingalls. She, for a nominal consideration, conveyed the legal title to them to William W. Secombe in trust for herself, her sister and her sister's children, with power of management and sale, the net proceeds to be divided, two-fifths to himself and the remainder to be paid over to them, according to a declaration of trust referred to in the deed. Secombe was president of the Secombe Manufacturing Company, which, in some way, held title to some other of Norton's patents. The Secombe Manufacturing Company, and Secombe, president, subsequently made conveyance of patents to Ingalls. The plaintiff derives title from her, and no other conveyance from Secombe to her is shown. The defendant claims that Secombe's title would not pass by that deed, and that, if it would, the description of the patents conveyed does not include this one. The deed recites the issuing of the patents, her desire to purchase, and that she has purchased of the Secombe Manufacturing Company and of William W. Secombe, president, the patents, and declares, that, in consideration of one thousand dollars, and other considerations, the said Secombe Manufacturing Company and William W. Secombe, president, do sell, assign and convey them to her; and it was executed by the signature of the Secombe Manufacturing Company, with seal, and by William W. Secombe, president, and another seal. It is obvious that there were intended to be, and were, two grantors in that deed. One was the company, and the other Secombe. The execution for the company, in the name of the company, was good for the conveyance of its interest. The execution by Secombe, although the addition to his name, of president, was made, was a good execution of the deed for himself, and good for that only, and not good to convey any interest for the company, even though

that had been the intention. That execution made the instrument his deed, and it would carry whatever title he had in the subject of the conveyance. Combes' Case, 9 Coke, 75; Clarke v. Courtney, 5 Pet. [30 U. S.] 319; Isham v. Bennington Iron Co., 19 Vt. 230; Miller v. Rutland & W. R. Co., 36 Vt. 452; Brinley v. Mann, 2 Cush. 337.

The description of the subjects of the conveyance is very general and broad, in some of its parts. It commences by reciting, that, "at various times and under several different dates," letters patent were issued, upon the application of Norton, for "improvements in hand printing and dating stamps, post-office postmarking stamps, internal revenue dating and cancelling stamps, and for other other improvements not necessary here to name, among which were letters patent of the following date, to wit, January 14, 1862; December 16, 1862; August 4, 1865; and also during the years 1870 and 1871." It then refers to the deeds of assignment from Norton to Ingalls, among others, for a more full description of the patents conveyed, and ends by adding: "Meaning to convey, and we do hereby convey, unto her, the said Helen M. Ingalls, each and every claim, right, title and interest we now have, or can or would have, in any of said inventions, improvements and letters patent, by means or reason of any contract between us, or either of us, and said Marcus P. Norton and Helen M. Ingalls, or either of them, in, to or for the said inventions and said letters patent, or either of them," &c. The reference to the patents, by stating the inventions covered, includes this one; and it is quite obvious, from the sweeping character of the instrument, that this and all other patents upon those subjects were intended to be included.

It may be, that, as the conveyance was wholly in trust, upon the evidence carefully examined, such refusal to perform the trust would appear as to cause the title to revert, and it may be that the interposition of a court of equity would be necessary for that purpose. But that subject has not been examined here, for the reason that the reconveyance appears to be amply sufficient.

The defendant also objects, that the plaintiff acquired no such right, by the deed to him from Ingalls, as authorized him to maintain this suit. The conveyance was expressly in trust, upon condition that the plaintiff should have the sole management of the trust, until a fair, just and reasonable settlement should be had with the United States for the use of the invention in the postal service of the United States, by the post-office department. It is argued, that the conveyance was for the purpose of such settlement, and no other. The operative words of the conveyance include the whole legal title to the patent, and all claims for the past use of the invention in the postal service of the United States. The limitation is one of time, upon the extent of the conveyance in that direction, and not upon its purposes. No settlement has been made with the United States, and the limitation in that respect has not expired. She has no legal title to the patent now. The plaintiff's right is the only one being infringed. He holds this right in trust, and may be liable to account for the proceeds of his management; but, whether he shall so account, or how, is not the question here. The question is merely, whether he has sufficient right to maintain the suit at all, and it appears that he has; certainly for the infringement since he has held the title, and the bill does not appear to be framed to cover anything else. Probably, Ingalls would be a proper party plaintiff with the orator, in the suit in equity, and, perhaps, a necessary party, if there had been objection on account of that non-joinder, but no such objection has been made, and, as she has been a witness, and testified that the suit is brought with her approval, there is no occasion for the court to interfere to secure to her an opportunity to assert her rights, as is sometimes done, in the discretion of courts, to guard the rights of cestuis que trust, which it is the peculiar province of courts of equity to protect.

One ground upon which the defendant claims he does not infringe is, that, in all he has done, he has acted as the officer of the government, in the performance of his duties for the benefit of the government, and that the monopoly granted, in granting the patent, did not extend to nor cover any use by the government. But, the exclusive use of the invention granted to the patentee is property; and this property is now owned by the plaintiff. The grant saved nothing for the use of the government; it was exclusive, absolutely, throughout the United States. It was granted by express law of congress, pursuant to the constitution, without which it could not exist. But, all property is upheld by law, either expressly or impliedly enacted or adopted, all of which is the law of the land, the same as the statutes upholding patents are. This property, like all other private property recognized by law, is exempt from being taken for public use without just compensation, by the supreme law of the land. Const. U. S. art. 5. Nor can it be so taken by any officer, at will, in time of peace, leaving the owner to seek compensation. Mitchell v. Harmony, 13 How. [54 U. S.] 115. The property in a patented invention stands the same as other property, in this respect. U. S. v. Burns, 12 Wall. [79 U. S.] 246; Cammeyer v. Newton, 94 U. S. 225. The defendant also claims that he does not use the patented invention. The answer hardly denies that he does, but the plaintiff has so far treated it as being denied as to put in some evidence of infringement. The instruments shown by the evidence to have been used have the postmarking and cancelling faces connected by a cross-piece, and balanced upon a brad-awl handle, substantially like those

of the patent. In one, the cross-bar is circular, and large enough to cover both stamps, and in the other the canceller is not tubed; but these things do not vary the principle of their action, nor affect their substantial identity with those patented.

This cause has been presented by counsel with great thoroughness of preparation, and faithfulness, and many points have been made that have not been specifically mentioned in what has been written, because none of them, in view of the facts upon which they rest, as found upon the evidence, or of the law as considered to be applicable, would be to a sufficient degree controlling of the conclusions reached upon the questions which have been mentioned, to warrant treatment of them in detail. The complainant has expressly waived taking a decree for an injunction, and, therefore, a decree for that purpose is not to be entered. Let a decree be entered that the patent is valid, that the defendant has infringed it, and for an account of profits and damages, with costs.

[NOTE. The master to whom the accounting was referred reported in favor of the complainant, and on the coming in of his report, and after hearing exceptions thereto, the exceptions were overruled, the report confirmed, and a final decree for complainant ordered. See Campbell v. James, 2 Fed. 338. Defendant James thereafter applied for a certificate of probable cause under section 989 of the Revised Statutes, providing for the relief of certain revenue officers from personal liability, which application was refused, on the ground that he was not a revenue officer within the meaning of the section. See Same v. Same, 3 Fed. 513. Subsequently motions for rehearing were made on various grounds by the complainant and the defendants James, Clexton, and Caswell, which motions were denied. See Same v. Same, 5 Fed. 806. An appeal was taken to the supreme court by the complainant and the defendants James and Clexton, where the decree of the circuit court was reversed, and the cause remanded, with direction to dismiss the bill of complaint. The supreme court made the foregoing disposition of the case upon the grounds as stated by Mr. Justice Bradley, who delivered the opinion, as follows: That Norton's re-issued patent, dated October 4, 1870, was void, by reason of not being for the same invention specified in the original; that if a patent fully and clearly describes and claims a specific invention, complete in itself, so as not to be inoperative or invalid by reason of a defective or insufficient specification, a re-issue cannot be had for the purpose of expanding and generalizing the claim, so as to embrace an invention not specified in the original,—reaffirming Burr v. Duryee, 1 Wall. (68 U. S.) 531,— and the court ought not to be required to explore the history of the art to ascertain what the patentee might have claimed, for he is bound by his statement of what his invention was; that a patentee cannot claim in a patent the same thing claimed by him in a prior patent, nor what he omitted to claim in a prior patent in which the invention was described, he not having reserved the right to claim it in a separate patent, and not having seasonably applied therefor; that a patent for a machine cannot be re-issued for the purpose of claiming the process of operating that class of machines, because, if the claim for the process is anything more than for the use of the particular machine patented, it is for a different invention (reaffirming Powder Co. v. Powder Works, 98

U. S. 139), and that the government of the United States has no right to use a patented invention without compensation to the owner of the patent (James v. Campbell, 104 U. S. 356; Clexton v. Campbell, Id.; Campbell v. James, Id.).

[For denial of motion to open the case after the dismissal of the bill and amended bill of complaint, see Campbell v. James, 31 Fed. 525.

[For other cases involving this patent, see Secombe v. Campbell, 5 Fed. 804; Campbell v. Ward, 12 Fed. 150; Shavor's Case, 4 Ct. Cl. 440.]