## SCHMITT v. NELSON VALVE CO. et al.

### (Circuit Court of Appeals, Third Circuit. October 30, 1903.)

### No. 44.

1. PATENTS—ASSIGNMENT—CONTRACT—EVIDENCE.

Evidence in a suit to restrain the infringement of a patent examined, and *held* to show that complainant, while in defendant's employ, made a contract agreeing to assign his patent to defendant in consideration of employment at a salary progressively increasing for 10 years, but to terminate on his discharge for cause.

2. SAME—FAILURE TO FULFILL CONTRACT.

The owner of a patent who agrees to assign it, but in violation of his agreement refuses to do so, cannot recover from his intended assignee for an infringement.

Acheson, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

In Equity.

Hector T. Fenton, for appellant.

George Wharton Pepper, for appellee.

Before ACHESON and GRAY, Circuit Judges, and McPHERSON, District Judge.

J. B. McPHERSON, District Judge. This bill in equity was filed to prevent the infringement of letters patent No. 675,979, issued to protect an improvement in valves, but it does not present the usual questions. No attack is made in this court upon the validity of the patent, nor is infringement denied, in case the complainant's right to maintain the suit should be upheld. The principal defenses that were set up in the court below, and are insisted upon here, are these: First, the defendant company has an equitable title to the patent, based upon the complainant's express parol agreement to assign it, although he has hitherto failed to carry out his contract; and, second, the defendant company is manufacturing the valves described in the patent under an implied license from the complainant. The facts established by the testimony are so clearly stated by the learned

judge of the Circuit Court that we adopt his findings as our own. His opinion, which is reported in 121 Fed. 93, is as follows:

"At the time of making this invention, and for some time prior thereto, the complainant was the superintendent and acting draftsman of the Nelson Valve Company. The need for the improvement which he devised was brought to his attention by a representative of the American Product Company, a buyer of valves, who explained to him that those which had been theretofore constructed by the Nelson Company were not satisfactory to the Product Company. He told him why they were not satisfactory, but did not tell him how they could be made so. He pointed out their defective operation, but proposed no remedy for it. He prompted the invention, but he had no part in making it. It was made solely by the plaintiff, but it was his connection with the Nelson Company which led him to make it. He has testified that it was conceived at his home, and that he there made a rough drawing of it; and I would not be warranted in wholly discrediting this testimony, either because he was unable to produce the drawing when the evidence was being taken, or because he had not shown it to Mr. Bonnell, an officer of the Nelson Company, to whom, as has been argued, he would naturally have exhibited it. On the other hand, there is nothing to impeach the testimony of Mr. Bonnell to the effect that the construction of the valve which would meet the requirements of the Product Company was the subject of a conversation, at the Nelson Company's works, between himself and the plaintiff, of the Nelson Company, and Mr. Beaston, of the Product Company, and that suggestions were then made by both Bonnell and Beaston. This may all be true, however, and yet the plaintiff's statement as to the time and place at which the invention was actually made be consistently accepted. That he, and he only, in fact made it, is, in this case, incontestable; and there is no necessary conflict between his assertion that he worked it out at his home and that of Mr. Bonnell that suggestions were made at the Nelson Company's works. In accordance, therefore, with the testimony of both of them, I find the fact to be that the invention was conceived, and was set forth in a rough drawing, at the residence of the plaintiff, but that suggestions, not effecting, in the sense of the patent law, any substantial change therein, were made at the works of the Nelson Company, before all the mechanical details of the particular valve to be manufactured for the Product Company were determined. The plaintiff made the working drawing for this valve in the company's shop, during working hours, and from the company's material. This drawing the Product Company approved, and at once ordered thirty-two valves. The plaintiff gave it to the Nelson Company's pattern maker, and had patterns and core boxes made from it, in the company's shop, from its materials, and by its men, who were paid by it for this work. The defendants contend that 'there was experimenting with this valve for several days in the company's shop'; but I do not think that what was really done has any legal significance. There was no experimenting by the inventor for the purpose of perfecting his invention. It was found that certain parts of the construction should be somewhat modified, and this was done, but without making any change in the original design which, with reference to the patent law, can be regarded as material. The 'valve spindle' was made heavier, and a hand hole, for convenience of access to the interior, was put in the casing of the valve; but neither of these affected the integrity of the device. Subsequently valves of the same pattern were made and sold to the Product Company and to another company; and up to the time when the complainant left the employ of the Nelson Company, on January 1, 1902, all of said valves were manufactured and sold under his direction, supervision, and orders, and were, by his direction, marked, 'Nelson Valve Co., S. & B., Pat'd,' as, with reference to a certain earlier patent of Schmitt and Bonnell, all the valves theretofore manufactured by the Nelson Company had been marked. The defendants contend that 'the complainant made no suggestion that he expected compensation (other than the salary he was drawing) for the manufacture and sale of the said valves until about August, 1901'; but the complainant disputes this statement, and claims that the evidence shows that 'the first valves were not put out until March, 1901'; that 'Schmitt spoke to Bonnell on the subject at or about that time'; and that the complainant (who

was in the employ of defendant until December 21, 1901), 'while permitting the defendant company to make and sell these valves during the year 1901, did so on the promise of defendant's officers that it would be made all right.' For solution of the question of the fact thus presented, we have but the testimony of Mr. Schmitt upon the one side and of Mr. Bonnell upon the other. The former testified that he had informed Mr. Bonnell that he had applied for a patent some time in March; that he told him that he wanted some compensation for his invention outside of his salary; that Mr. Bonnell replied, 'We will make these valves and adjust these small difficulties afterwards.' Mr. Bonnell testified that 'no conversation of that kind ever took place'; that 'there never was such a conversation'; that 'there was nothing of that kind said'; and that he 'never had any conversation with Mr. Schmitt in regard to compensation which he was to receive for the use by the company of this patent.' It is only upon the assumption that such a conversation may have occurred and have been forgotten by Mr. Bonnell that the veracity of both of these witnesses can be sustained, and therefore I deem it to be incumbent upon me to adopt that assumption. Accordingly, I find that Mr. Schmitt did tell Mr. Bonnell that he wanted some compensation for his invention, and that Mr. Bonnell replied, in substance, 'We will proceed manufacturing these valves, and will straighten this small difficulty later on.' As to the time at which this occurred, the testimony of Mr. Schmitt was very vague and inconclusive. He said that his recollection was that it took place after his application, which is dated March 12, 1901; that he did not recollect whether anything had been done in the way of manufacturing these valves at the time; and though, immediately afterwards, he said that 'they had not manufactured them before,' yet this seemingly positive statement was in turn followed by a reiteration of his previous avowal that he did not recollect whether the company had or had not manufactured or taken any steps towards the manufacture of these new valves prior to the date of the conversation. The first order was given on or about the last day of February, and the first delivery was made on March 11, 1901; and Bonnell's testimony is that Schmitt never advised him that he had applied for the patent prior to April or May. I therefore cannot say that the conversation in question took place before the Nelson Company had, with Schmitt's knowledge and assent, sold and delivered valves embodying his invention. On the contrary, the testimony as a whole has convinced me, and accordingly I find, that whatever was said by Schmitt on the subject of compensation was said after some of these valves had been ordered, made, and delivered; that Bonnell then indefinitely postponed consideration of the matter; and that Schmitt acquiesced in that postponement, without any understanding having been reached as to whether he was to be compensated by raising his salary as prior to the making of this invention had several times been done, or by paying him a royalty or license fee. The statement made by Schmitt that the 'little difficulty' to which Bonnell had referred was 'royalty' is mere surmise. There is no evidence to support it, and Bonnell testified that nothing was ever said by him to Schmitt about royalty.

"It is admitted on both sides that there was a parol agreement made between these parties on October 26, 1901, but they differ as to what that agreement was. The undisputed facts are that a special meeting of the directors of the Nelson Valve Company was held upon October 26, 1901, at which a majority of the board and Mr. Schmitt himself were present, and at which a paper was drawn up, and signed by all the directors in attendance, as follows:

" 'It is agreed by the Nelson Valve Company, its successors and assigns, that the salary of H. J. Schmitt shall be as follows from January 1, 1902, to June 30, 1904, at the rate of forty-five dollars per week, payable weekly, from June 1, 1904, to December 31, 1906, at the rate of fifty dollars per week, payable weekly; from January 1, 1907, to June 30, 1909, fifty-five dollars per week, payable weekly; from July 1, 1909, to December 31, 1911, sixty dollars per week, payable weekly, for services to be rendered to the said Valve Company, its successors and assigns.

" 'S. F. Houston.
" 'E. W. Ward.
" 'Russell Bonnell.'

"An attested copy of this paper was given to Schmitt, and subsequently he requested a copy under the company's seal, and this was given to him in substitution for the attested copy. Schmitt has testified that at this meeting all open questions between him and the company were settled, and, indubitably, the assignment of this patent was then agreed upon. But the parties disagree as to the terms upon which this was to be done. The defendants insist that the paper of October 26, 1901, contained the entire agreement on the part of the company, and that thereupon the defendant orally agreed to have his counsel prepare and to execute an assignment to the Nelson Company of, inter alia, the patent in suit. The plaintiff, on the other hand, contends that his agreement to assign was made 'in consideration of a promise of employment for ten years from the following January, 1902, at an increased salary.' The question, briefly stated, therefore, is, did Schmitt agree to assign in consideration of the company's undertaking as set forth in the writing of October 26, 1901, without the assumption by it of any obligation to continue him in its employ, other than such as is by law attached to such an undertaking, or was it further and additionally agreed that the company would absolutely, and under all contingencies and conditions, retain him in its employment for ten years? The question admits of but one answer. It is hardly conceivable, I think, that the company would, if asked, have promised that for ten years it would keep Schmitt in its service, no matter what occasion should arise to justify a determination of his connection with it; and though it is true that the paper of October 26, 1901, did not set out the agreement of Schmitt, yet to me it seems to be evident that it was intended to present the entire agreement on the part of the company, and that the stipulation on its part which the complainant now asserts was made would not have been omitted from it if in fact it had been made. But probabilities and presumptions need not be dwelt upon, for the weight of the evidence directly upon the subject is unquestionably with the defendants. Bonnell, Ward, and Houston, all, in substance, testified that Schmitt expressed himself as being satisfied with the paper which they signed, and that in consideration of the promise evidenced by it, and of that alone, he agreed to assign this patent, and I believe, and therefore find, such to be the fact, notwithstanding the testimony of Schmitt himself to the contrary. I need not impute to him conscious and deliberate falsification, but the utmost that can be fairly said in his exculpation is that some time after the agreement in question had been actually made he was led to think that the writing was not as advantageous to him as it should be, and that, dwelling upon this thought, he may have persuaded himself that an additional oral promise had been made to him, although the fact was otherwise. At all events, he refused to assign the patent unless the company would covenant for his employment for ten years, and this it has declined to do.

"I do not deem it necessary to decide whether or not, at any time prior to the meeting of October 26, 1901, the Nelson Company had acquired an implied license to manufacture and sell the invention covered by the patent in suit, or to determine whether, in point of fact, the valves which it has made and sold embodied that invention; for, in my opinion, the agreement of October 26, 1901, is, in itself, a sufficient and full defense to this suit. It canceled all claims (if any) then existing, for it settled all 'open questions'; and that by virtue thereof the Nelson Company became the equitable owner of the patent itself seems to me to be scarcely questionable. Walker on Pat. § 274; Dalzell v. Dueber Co., 149 U. S. 320, 13 Sup. Ct. 886, 37 L. Ed. 749. A complainant who has refused performance of a contract cannot be awarded relief to which, if he had performed it, he would not have been entitled."

Upon the facts thus found, we agree that the defense of equitable ownership has been established. It is no doubt true that the complainant made a contract that in some respects was perhaps unwise. It would have been much more to his interest if the agreement had provided either that the company would not discharge him for 10 years, or that his increased compensation should be paid to him whether he remained in the company's service or not, and it might

have avoided this dispute if the parties had agreed to put their contract in writing. But neither provision formed part of the parol agreement that was made on October 26, 1901, and if we should now add these terms, or any one of them, to the contract, we should be making a new agreement for the parties—an agreement which they did not choose to make for themselves. The evidence satisfies us that when the prolonged discussion of October 26th came to an end all open questions between the parties had been settled and determined, and a definite agreement had been entered into. What the complainant was to do appears clearly from the testimony of several witnesses. He was to assign to the company two patents—the patent in suit, and one other—and was to put at the company's disposition any similar inventions that he might make while he continued in their employ. He carried out part of his agreement by assigning immediately one of the patents, for which the deed had already been drawn and only needed his signature to be complete. The patent in suit was to be assigned by an instrument which his counsel was to prepare, and this should have been a paper in the ordinary form, conveying the letters patent directly to the defendant company. Instead of such a paper, however, his counsel prepared, and he submitted to the company, a writing in the following terms:

"The said Henry J. Schmitt being the patentee of a certain valve under letters patent No. 675,979, and the said Nelson Valve Company being manufacturers of valves and desiring an assignment to them of said letters patent of said Henry J. Schmitt, bargain and agree as follows:

"In consideration of the assignment of said letters patent to the said Nelson Valve Company, it is agreed that the said Valve Company shall well and truly pay to the said Henry J. Schmitt the sum of forty-five dollars ($45.00) per week, payable weekly, from January 1st, A. D. 1902, to June 30th, 1904; and at the rate of fifty dollars ($50.00) per week, payable weekly, from July 1st, 1904, to December 31st, 1906; and at the rate of fifty-five dollars ($55.00) per week, payable weekly, from January 1st, 1907, to June 30th, 1909; and at the rate of sixty dollars ($60.00) per week, payable weekly, from July 1st, 1909, to December 31st, 1912.

"But it is understood and agreed that the said Henry J. Schmitt shall contribute his services daily to the said Nelson Valve Company as superintendent of the manufacture of valves, from the first day of January, 1902, to the thirty-first day of December, 1912, provided that the said Nelson Valve Company desire or have use for said services, but in the event of the failure of said Nelson Valve Company in this regard, then the said sums or weekly payments above mentioned shall be due and payable as a consideration for the assignment of the patent rights without regard to services rendered or to be rendered."

Manifestly, this was not the assignment that he had agreed to make—it does not contain a word that could be construed to pass the title to the patent—but was an attempt to vary the contract of October 26th by adding a new provision entirely in the complainant's interest. In the correspondence that followed stress seems to be laid also upon the fact that the company's resolution, in speaking of "services to be rendered," did not add "as superintendent" or some similar phrase, and thus left Schmitt's position (so it is said) at the company's mercy. We do not see the importance of adding the suggested words. The resolution clearly implied an agreement by the company to avail itself of Schmitt's "services"; in other words, to

continue him in its employ for 10 years, and to pay him a weekly salary for his work. The company did not bind itself to continue him as superintendent, but it was certainly bound to accept his "services" as long as he conducted himself properly and furnished no just ground for discharge. It would be extraordinary to find in such a contract a positive agreement to keep a servant in one position for 10 years, and in any event to pay him wages, whether he had been discharged or not, and even if he had been discharged for abundant cause; and, while such an agreement may no doubt be made, its unusual character is of itself enough to lend strong support to the defendant's contention that in the present instance the agreement was not entered into. If it had been a part of the company's obligation, it is scarcely conceivable that Schmitt would have accepted the resolution without insisting that an omitted provision, that was of so great importance to him, should be plainly expressed.

The complainant relies with apparent confidence upon Dalzell v. Dueber Co., 149 U. S. 315, 13 Sup. Ct. 886, 37 L. Ed. 749, as substantially on all fours with the case at bar. An examination of the opinion discloses, however, that the points actually decided were, first, that an oral agreement for the sale and assignment of the right to obtain a patent for an invention is not within the statute of frauds, nor within section 4898 of the Revised Statutes [U. S. Comp. St. 1901, p. 3387], requiring assignments of patents to be in writing, and may be specifically enforced in equity upon sufficient proof thereof; and, second, that under the evidence then being considered no such agreement had been proved by evidence sufficiently clear and satisfactory to justify a court of equity in making a decree of specific performance. A witness for the Dueber Company had testified that Dalzell had voluntarily offered to have his invention patented in the name of the company, with no other motive than to prevent the workmen of the Dueber Company from injuring it by communicating the invention to rival companies, and for no other consideration than payment by the Dueber Company of the expense of obtaining the patents, and without himself receiving any other consideration, benefit, or reward, *and without the company's even binding itself for any fixed time to pay him the increased wages or to keep him in its service.* The phrase that we have italicized is obviously what the complainant relies upon to affect the present controversy, but it is not applicable to the facts as we have found them to be established. The essential difference between the two cases is that, while no contract at all was proved there, a contract was proved here on the part of the company—it is clearly evidenced by the resolution of October 26th—to pay to the complainant the increased wages for a fixed time and to keep him in the company's service. If he had fulfilled his part of the bargain, and had continued to render faithful service to the company, his place and wages were secure for 10 years; or, at least, if he had been improperly discharged, he would have had a good cause of action upon the contract, and could have recovered compensatory damages. It is true that the contract did not bind the company to retain him in its service, even though proper grounds for discharge might exist; but we see nothing in the language just quoted to require

us to suppose that the Supreme Court of the United States had such an unusual provision in mind, and intended to intimate that unless Dalzell had been protected against discharge, even if he should deserve it, the agreement would be too unconscionable to be enforced.

This seems to be the whole case. The dispute is simply a question of fact, and, having determined the question in favor of the defendants, nothing remains except to add, in the language of the court below: "A complainant who has refused performance of a contract cannot be awarded relief to which, if he had performed it, he would not have been entitled." If this view of the case be correct, it would obviously be superfluous to consider the question of implied license.

The decree is affirmed, with costs to the defendants in error.

ACHESON, Circuit Judge (dissenting). I dissent from this decree. The paper signed at the meeting of October 26, 1901, by the three directors of the company then present, namely, Houston, Ward, and Bonnell, was an ex parte memorandum. Manifestly it is incomplete. It recites no consideration. It does not show any contract. Indeed, unless supplemented by oral testimony, the paper would not be evidence at all against the corporation. Mr. Bonnell was a witness for the company, and speaking of what occurred at the meeting of October 26th, and referring to the paper signed by himself and the two other directors, he testified thus: "Q. 6. I understand from you that the whole contract was not put down in writing? A. No; it was not." It is plain to me from all the evidence that a further writing was contemplated. The plaintiff was rightly advised by counsel that he could not safely rely upon the paper which the three directors signed. No doubt the writing which the plaintiff submitted to the company was open to criticism, but no specific objection was made to it. Good faith required the company to specify wherein it was objectionable. The company, however, took the arbitrary position that the plaintiff must be content with the incomplete ex parte memorandum of October 26th, and should execute to the company an absolute assignment of his letters patent. Had the plaintiff complied with this unfair demand, he would have been left without any adequate protection. The plaintiff, in my judgment, was entitled to some writing embodying the whole contract. The conduct of the company was so unreasonable that a court of equity, it seems to me, would not decree in its favor specific performance of the alleged oral contract. Yet the effect of the decree here is to strip the plaintiff of his patent and give it to the defendant without any compensation whatever. The result, I think, is inequitable.