**F. A. R. LIQUIDATING CORP. v. McGRANERY, Attorney General.**

Civ. A. 1462.

United States District Court
D. Delaware.

Feb. 24, 1953.

E. Ennalls Berl, of Wilmington, Del., of Berl, Potter & Anderson, Wilmington, Del., and Ernest S. Myers and Lawrence R. Eno, New York City, of Laporte & Meyers, of New York City, for plaintiff.

Rowland F. Kirks, Asst. Atty. Gen., William Marvel, U. S. Atty., District of Delaware; Wilmington, Del., James D. Hill, Walter T. Nolte and Harold Ungar, of Washington, D. C., for defendant.

LEAHY, Chief Judge.

F.A.R. Liquidating Corporation.[1] a Delaware corporation, sues under § 9(a) of the Trading With The Enemy Act of October 6, 1917, c. 106, 40 Stat. 411, as amended, 50 U.S.C.A.Appendix § 9(a). Plaintiff

---

1. Prior to May 1949 it was known as Farnsworth Radio & Television Corporation. Here, both corporations will be referred to as "Farnsworth".

brings its action to have itself declared owner of certain United States patents vested by the Alien Property Custodian, pursuant to § 5(b) of the Act, Herbert Brownell, Jr. and predecessor Attorney-Generals of the United States having succeeded to the authority and functions of the Alien Property Custodian. Plaintiff moves for summary judgment pursuant to Fed.Rules Civ. Proc. rule 56, 28 U.S.C.A., on the grounds there is no genuine issue as to any material fact and that Farnsworth is entitled to relief because, at the time of vesting in defendant's predecessor, it was lawful owner or assignee of the patents or of the contract and equitable rights in them. Defendant cross-moved for summary judgment on the ground the patents were lawfully vested by the Custodian and that Farnsworth has no right in them.

The critical issue on both motions is whether certain cables sent from Germany to Farnsworth by a German company on June 14, 1941 constituted an assignment to Farnsworth of the patents, or a contract to assign them. If they did, defendant reluctantly concedes Farnsworth is entitled to judgment. Defendant, however, contends the transaction could not be concluded without a confirming cable from Farnsworth to the cables of June 14. The question for me, then, is whether such a confirming cable was necessary before there could be an assignment or a contract between Farnsworth and the German company.

### The Facts Circa June 14, 1941.

On June 26, 1935, Farnsworth Television, Incorporated, a California corporation, entered into an agreement with a German corporation, Fernseh Aktiengesellschaft (also known as Fernseh G.m.b.H.), located in Berlin-Zehlendorf, Goerzalle.[2] Under the agreement, Farnsworth Television, Incorporated, granted licenses to Fernseh in certain European countries under patents of Farnsworth Television, Incorporated, relating to television, radio, talking pictures and electrical transcription; and Fernseh granted similar rights under its patents to Farnsworth Television, Incorporated, in the United States and certain other countries. The agreement was amended on October 21, 1937, in respects not here material, but was to last until 1955, and for additional three-year periods thereafter.

In December 1938, Farnsworth acquired all patents of Farnsworth Television, Incorporated, and Fernseh consented to the assignment of the patent licensing agreement to Farnsworth. Prior to June 1941, under the agreement, Fernseh received licenses under Farnsworth's patents and applications in certain European countries, including Germany and Austria. These covered patents issued prior and subsequent to September 1, 1939. Under the agreement Farnsworth received licenses under Fernseh's patents, granted in the United States prior to September 1, 1939, and thereafter. Fernseh's United States patents, the subject of this suit, comprise 111 patents.[3]

In November 1939, Farnsworth was dissatisfied with the agreement from a commercial standpoint and communicated its desire to Fernseh for a revision of the original license agreement. Thereafter, on February 24, 1941, Farnsworth initiated negotiations with Fernseh by cable for a revision of the agreement. Two days later, Farnsworth's board of directors authorized the negotiation for revision. No reply from Fernseh was had; Farnsworth then, on March 17, by cable, repeated its former cable of February 24. Farnsworth's board was advised of these facts on March 26, 1941. By cable of April 1, Fernseh finally answered, suggesting more definite proposals. On April 4, Farnsworth replied by cable, proposing the assignment of all its patent rights in Europe to Fernseh and the assignment to it of all Fernseh's patent rights in the United States. No reply from

2. The latter German corporation will be referred to as "Fernseh".

3. In 1941, Fernseh's United States patents were in its name in the United States Patent Office. Farsnworth's European patents in Germany and Austria were in Fernseh's name in the patent offices of those countries and its European patents in other countries were under its own name. In 1941, most of those countries were under German occupation or domination.

Fernseh was had until May 13 when it, in turn, suggested: (1) the mutual assignments be limited to patents or applications which had been granted or filed prior to September 1, 1939; (2) the new arrangement would supersede the existing agreement as of the date of Farnsworth's receipt of a cable from Fernseh confirming Farnsworth's acceptance.[4] On the same day, May 13, Fernseh wrote a letter to Farnsworth. It repeated the statements made in its cable and discussed a proposal to handle patent applications filed after September 1, 1939. The letter said the new arrangements would have to be consummated by cable.

On May 15, Farnsworth cabled its reply to Fernseh's proposal. It accepted the proposals except for one item, dealing with an existing license agreement with the American Telephone & Telegraph Company, which was to remain unaffected. A cut-off date of September 1, 1939, with respect to the mutual assignments was agreed upon because the United States and European patents as of that date were of approximately equal value. The May 15 cable read as follows:

"We offer to make agreement with Fernseh as set forth in your cable of May Thirteenth Nineteen Hundred Forty-One excepting only quote fourth unquote point which point is not possible because of existing Farnsworth-RCA and RCA-European agreements (Stop) Fernseh-Farnsworth agreements now existing to be abrogated as of effective date of present proposed agreement (Stop) Regarding quote sixth unquote point (Comma) Costs to be borne by party handling (Stop) If you wire your acceptance of this offer our confirming cable to you will constitute a binding agreement between us effective upon date of confirming cable (Stop) Have arranged special meeting our directors for May Twentieth to approve agreement if acceptable to you (Stop) If this arrangement acceptable to you suggest you also cable authority to rep-

resentative in United States to execute for you formal Patent Office Assignment."

At the February 26 meeting of Farnsworth's board it was concluded any new agreement was subject to approval by the board. Prior to approval by its board, Farnsworth could not enter into any binding agreement. Hence, the provision that the new agreement would be effective on the date of Farnsworth's confirming cable after Fernseh's acceptance. On May 16, Farnsworth asked its board for ratification of the proposed arrangement. No reply having been received from Fernseh, Farnsworth's board postponed its meeting from May 20 to May 22. Unknown to Farnsworth, Fernseh had received the cable of May 15 on May 17 and its officials had, in fact, on May 19, approved the new agreement. Fernseh, however, had to get authorization from the German authorities. Fernseh urged upon the German authorities that its reply, already drafted, had to be sent no later than May 19 to arrive in time for the meeting of Farnsworth's board on May 20. The German authorities did not act. Fernseh, therefore, did not dispatch its acceptance in time for the meeting of May 20. Although no reply had been received from Fernseh, Farnsworth's board had a special meeting on May 22. The cables of May 13 and 15 were read. At the meeting it was also stated the United States government had been consulted and that the proposed transaction did not conflict with any policy of the government. The board ratified the action taken by the cables of May 13 and 15 and authorized the consummation of the arrangement as set forth in those cables, with such changes as the President of Farnsworth might deem necessary.

1. The critical cables as to whether plaintiff is entitled to relief will now be discussed. On May 28, not having heard from Fernseh, Farnsworth cabled again. The cable stated: "We cabled you on May 15 as follows." Then followed a full quote of the May 15 cable. The May 28 cable

---

4. Subsequent evidence, unknown to Farnsworth at the time, shows the reason for this last requirement was the necessity of Fernseh to secure the consent of authorities of the German government before the transaction could be completed.

then concluded: "Our directors have approved Agreement (stop) Awaiting your answer." On June 4, Fernseh cabled its receipt of the May 28 cable and advised Farnsworth to expect final answer in a few days. Unknown to Farnsworth the German authorities had issued a favorable response to Fernseh. Then, on the afternoon of June 13, Fernseh was informed the new agreement would be authorized by the German authorities and on June 14 sent its cables. According to plaintiff, its May 28 cable was an offer, and Fernseh's cable of June 14 to Farnsworth was an acceptance. That cable read as follows:

"We accept your offer in your cable of day [sic., May] Twentyeight 1941 consider abrogation of existing agreements and mutual assignment of patents as binding Stop We authorize Mr Martin as our representative by separate cable suggest you also cable authority to representative here for instance Wilhelm Reichel Berlin Zehlendorf Goerzallee 299 as follows Wir Revollmaechtigen Hierdurch insert name Zur Wahrenehmung Unserer Patentinteressen Inbesondere Zur Anmeldung Bearbeitung Geltendmachung Veraeusserung Und Uebertragun Von Schultzrechten In Den Laendern Des Europaeischen Festlandes Fernseh Gmbh Goerz Moeller"

Fernseh also on June 14 sent a cable to Martin, patent attorney and secretary of Farnsworth, which read as follows:

"We authorize hereby Edwin M. Martin 3700 East Potiac Street Fort Wayne Indiana to sell assign and transfer the whole rights titles and interests in and to all letters patent for which he is appointed as our attorney and filed in our name or in the name of Fernseh Aktiengesellschaft in the United States on and before September First 1939—Fernseh Gmbh Goerz Moeller"

On June 14, 1941, at 1:10 P.M. in Washington, D. C., Executive Order 8785 went into effect.[5] This order amended Executive Order 8389 of April 10, 1940,[6] to bring within its orbit nationals of Germany. Under the order, approval of the Secretary of the Treasury was necessary before any further steps could be taken pursuant to the agreement.

(Although no affirmative defense was formally made by defendant that the cable was sent from Germany *after* the effective date of the Executive Order, nevertheless, at argument this point was discussed at some length. Defendant argues there is no evidence Fernseh's June 14 cable was deposited in the German cable office prior to the effective time when the Executive Order went into effect on June 14, 1941, at 1:10 P.M. A Fernseh file note of June 18, 1941, affirms that Fernseh had secured the consent of the German authorities on June 13 and had sent its cables on June 14, 1941. As stated, defendant never challenged these cables were dispatched before the Executive Order went into effect. Accordingly, this was not an issue in the case. However, in view of the discussion which occurred at argument, plaintiff demonstrated by expert evidence the cables were dispatched from Germany before the effective time of the Executive Order. I accept this evidence and hold the June 14 cable was dispatched, in point of time, before the Executive Order became effective.)

On June 20, 1941, Farnsworth applied to the Treasury Department for a license. Action was delayed on the application until after the outbreak of war with Germany in December 1941. On June 18, by Vesting Order No. 27,[7] and on September 24, 1942, by Vesting Order No. 171,[8] the Custodian vested Fernseh's United States patents pursuant to § 5(b) of the Act. In May 1943, Farnsworth filed its claim with the Custodian arising out of the vesting orders. In November 1946, at the request of the Custodian, Farnsworth filed various documents supporting its claim. This claim, as far as the present record is concerned, is still pending and undetermined. In short, there has never been any formal jural or

---

5.  6 F.R. 2897.

6.  5 F.R. 1400; see 12 U.S.C.A. § 95a note.

7.  7 F.R. 4629.

8.  7 F.R. 8510.

administrative review of Farnsworth's claim.

█ 2. Farnsworth, by depositing its cable of acceptance in the German cable office, on June 14, 1941, brought into existence a binding contract between Farnsworth and Fernseh. That contract gave, if not the legal, the equitable title to Fernseh's United States patents to Farnsworth.[9] The finding of contract is supported by a consideration of certain master facts. For example, on May 13, 1941, Fernseh cabled specific proposals to Farnsworth. These were accepted by Farnsworth by cable on May 15—with one exception. Since Farnsworth's board had, on February 26, decided that any agreement must be subject to its approval, the May 13 cable had to provide the agreement would be binding from the date of Farnsworth's cable confirming Fernseh's acceptance. Clearly, this was the sole reason for the confirming cable. No reply from Fernseh was received by May 20 but Farnsworth's board met on May 22, when it, although no reply from Fernseh had yet been received, approved the agreement and arrangements set forth in the cable of May 15. With such approval, there was no longer need for confirming cables. However, on May 28, Farnsworth sent its other cable. The May 28 cable neither repeated nor provided a confirming cable from Farnsworth would be necessary to crystallize the contract. Elimination of condition for a confirmatory cable was clearly within the power of the President, who sent the cable, conferred on him by the May 22 meeting. Fernseh understood from the cable of May 28 the confirming cable from Farnsworth was no longer necessary. To look at Fernseh's cable of June 14 makes this clear, where it stated: "We accept your offer in your cable of day [sic., May] Twentyeight 1941 consider abrogation of existing agreements and mutual assignment of patents as binding". Also, on May 28 Fernseh cabled authority to Martin to execute the formal assignment for recordation on Fernseh's behalf. Fernseh would not have put such power in Farnsworth's hands had it not regarded the contract as complete. This is shown by its subsequent letter of June 16. In that letter no suggestion was made of further necessity for Farnsworth to send a confirming cable; in fact no mention was made of the point. Again, in its cable of July 1, 1941, Fernseh did not ask or inquire about a confirming cable.[10]

The government argues even if a confirming cable was not necessary, the general tenor of the correspondence between the parties shows they intended no contract was to come into existence until the receipt of the acceptance by the offeror—Farnsworth. This is not the fact. Only mention of a provision for "receipt" of anything is that contained in Fernseh's early cable of May 13. Under undisputed facts, Farnsworth never required receipt of acceptance as a condition for creation of a binding contract.

Defendant has further argument whether Farnsworth made an assumption (in a certain memorandum submitted to the Custodian) it had inadvertently not indicated to Fernseh a confirming cable was not necessary to create the contract. The argument has been considered and is found to have no merit.

█ 3. I think a complete assignment of Fernseh's United States patents was made to Farnsworth by the cables of June 14, 1941. A Custodian's powers to acquire rights in the patents could be no greater

9. 2 Walker on Patents (Deller's Ed.), p. 1435; Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149.

10. In any suit, for example, between Farnsworth and Fernseh, as Farnsworth had led Fernseh to believe no confirming cable was necessary, and Fernseh had acted on that belief, the latter's belief would govern and its acceptance—as in the case at bar—would constitute the contract.

O'Neil Supply Co. v. Petroleum H. & P. Co., 280 N.Y. 50, 55, 19 N.E.2d 676; U. S. Rubber Co. v. Silverstein, 229 N. Y. 168, 128 N.E. 123; Gates v. Megargel, 2 Cir., 266 F. 811, 818, certiorari denied 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 452; Sun Oil Co. v. Dalzell Towing Co., 2 Cir., 55 F.2d 63, 64–65, affirmed 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311.

than the rights Fernseh had in them when the vesting orders occurred.[11]

On June 14, 1941, Fernseh assigned its title to the patents to Farnsworth. Thereupon all rights vested in Farnsworth. The June 14, 1941 cable from Fernseh to Farnsworth constituted the assignment. The former's cable of May 13 defined the patents involved in the assignment, to which Farnsworth had agreed on May 28. Fernseh's June 14 cable, in stating "Consider * * * mutual assignment of patents as binding", thus stated, as far as it was concerned, it had assigned its United States patents to Farnsworth. The assignment, by means of the June 14 cable, became effective when Fernseh deposited it in the German cable office for transmission to Farnsworth.[12] The only statutory requirement is for an assignment to be in writing.[13] Fernseh's June 14 cable met this requirement. An assignment need not be in any particular form so long as the intention is clear the owner intends to assign.[14] And, no specific identification of patents assigned need be by name, number or date.[15] In fact, inter partes, even statutory requirement of writing is unnecessary to constitute a valid assignment. Oral assignments have been held to convey all equitable and bene-

ficial title to the patents involved.[16] Moreover, inter partes, it is immaterial an assignment is not recorded.[17] The effect of such noted deficiencies is merely to make the assignment void as to subsequent purchasers or mortgagees without notice. I find the assignment, here, is clear; and there is no ambiguity in its terms.

4. Defendant argues that if cable correspondence leaves any doubt or contains any ambiguity as to whether a contract was made, such doubt is resolved by the understanding of the parties, as evinced by their conduct after June 14, 1941.[18] For example, defendant argues plaintiff interpreted Executive Order 8785 as prohibiting the recording in the Patent Office of "the cable assignment" unless a license was obtained from the Secretary of the Treasury. Defendant then points out plaintiff applied to the Treasury Department for a license to authorize execution of formal assignments to Fernseh and to execute and record a formal assignment to plaintiff of Fernseh's United States patents. Other actions of Farnsworth are cited for its awareness there was no completed assignment or contract. Reference is made to certain modifications proposed by government officials in connection with the relief sought by plain-

11. Standard Oil Co. v. Clark, 2 Cir., 163 F.2d 917, certiorari denied 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149.

12. 1 Williston on Contracts (Rev.Ed.), §§ 81, 86; Chapman v. Mills & Gibbs, D.C., 241 F. 715, affirmed 2 Cir., 250 F. 1018; Taylor v. Sanford, 108 Tex. 340, 193 S.W. 661, 5 A.L.R. 1660; Lynch v. Johnson, 171 N.C. 611, 89 S.E. 61; M'Kinney v. Rhoads, 5 Watts, Pa., 343.

13. 35 U.S.C.A. § 47.

14. Jonathan Mills Mfg. Co. v. Whitehurst, C.C., 56 F. 589, 594, affirmed 6 Cir., 72 F. 496; McClaskey v. Harbison-Walker Refractories Co., 3 Cir., 138 F.2d 493, 499; Kenyon v. Automatic Instrument Co., 6 Cir., 160 F.2d 878, 882.

15. Delaware Seamless Tube Co. v. Shelby Steel Tube Co., 3 Cir., 160 F. 928, certiorari denied 212 U.S. 580, 29 S.Ct. 689, 53 L.Ed. 659; Aeolian Co. v. Hallett & Davis Piano Co., C.C., 134 F. 872, 873.

16. Westinghouse Electric & Mfg. Co. v. Formica Insulation Co., 6 Cir., 288 F.

330, 333, affirmed 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316; Dalzell v. Dueber Watch Case Mfg. Co., 149 U.S. 315, 320, 13 S.Ct. 886, 37 L.Ed. 749; Prest-O-Lite Co. v. Avery Portable Lighting Co., C.C., 164 F. 60; Schmitt v. Nelson Valve Co., 3 Cir., 125 F. 754; Spears v. Willis, 151 N.Y. 443, 451, 45 N.E. 849.

17. Delaware Seamless Tube Co. v. Shelby Steel Tube Co., supra; John Tuman & Sons, Inc. v. Basse, 2 Cir., 113 F.2d 928; Why Corporation v. Super Ironer Corp., 6 Cir., 128 F.2d 539.

18. Here, defendant relies on a point discussed in Speed v. Transamerica Corp., D.C.Del., 99 F.Supp. 808, where, at page 821, I wrote:
"Behavior rather than words among men and women is most significant in ascertaining intent. Attorney General v. Drummond, 1 Drury & Warren, 353, 368 (Lord Chancellor Sugden, 'Tell me what you have done under such a deed, and I will tell you what that deed means.')"

tiff. The meetings of Farnsworth's board of directors are examined, as well as Farnsworth's treatment of Fernseh's U. S. patents and Farnsworth's treatment of Farnsworth's European patents, to support defendant's position. The actions of Fernseh should be examined, as well as its treatment of Farnsworth's European patents, and Fernseh's treatment of Fernseh's U. S. patents—it will then, defendant contends, be demonstrated the actions of the parties post June 14, 1941, show no-one concerned ever considered a binding agreement and assignment had occurred from Fernseh to Farnsworth on June 14, 1941.

Events subsequent to June 14, 1941, have legal relevance, in showing the intentions of the parties, only if it is found there is a real ambiguity with respect to the contractcables of June 14. I have concluded there is no ambiguity at this point and that, in law, a contract and assignment of patents was had on June 14. Under my view, therefore, events occurring after June 14 are not acts of independent legal significance. Thus, there is no logical necessity to discuss what the parties did subsequent to the date mentioned. As defendant places such stress on those events, and this being the kind of case it is, defendant is entitled to my views of this phase of the case.

### Actions of Farnsworth

■ A. *The application to the Treasury Department.* On June 20, 1941, Farnsworth applied to the Treasury Department for permission to execute formal assignments to Fernseh and to execute and record in the Patent Office a formal assignment to Farnsworth from Fernseh. This request of plaintiff for permission to execute formal assignments was merely an assertion that, as between the parties, an assignment of the patents had, in law, already occurred and the contract between the parties had become complete on June 14. In fact, in papers filed with the Treasury Department, Farnsworth stated: "These negotiations *culminated* in the acceptance by Fernseh G.M.B. H., by cable dated June 14, 1941, of an offer by Farnsworth, by cable dated May 28, 1941. In accordance with the offer and acceptance, the agreements in question *are* cancelled, certain U. S. patents and patent applications owned by Fernseh *are* assigned and transferred to Farnsworth, and certain Continental European patents and patent applications owned by Farnsworth *are* assigned and transferred to Fernseh" (Emphasis added.).

■ It appears when Farnsworth sought permission of the Treasury Department for a license it was not attempting to create or bring into existence a contract between the parties. All that was asked was permission to complete formalities. The administrative relief sought was permission that Farnsworth could take a formal license or a ruling that no license was required. This admitted no change of position. Applicant acted out of an abundance of caution to make certain it violated no governmental regulation in proceeding under its cablecontract with Fernseh. In fact, the application shows Farnsworth was seeking merely permission to convey technical information to Fernseh. Plaintiff's dealings with the Treasury Department indicates no shift of position. In fact, the government knew Farnsworth's position as early as September 16, 1941; it never expressed any dissent. This phase of defendant's case is bottomed on the postulate that Martin, a legal representative of Farnsworth, had one opinion as to the jural effect of Fernseh's June 14 cables on June 20 and another on September 16. Obviously Martin's legal opinion is not material; it is not admissible even as an admission;[19] and it is not evidence as to whether, in law, a contract and an assignment was in existence on June 14 between the parties.

■ B. *Modifications proposed by government officials.* Representatives of the Treasury and Justice Departments, after Farnsworth filed its application for a license on June 20, 1941, suggested Farnsworth make some "counter-proposals" to Fernseh. There are implications if these counter-proposals were not made the license would be denied; and if made the license would be granted. One of the counter-proposals had to do with the difficulty of the

19. Grand Trunk Western R. Co. v. H. W. Nelson Co., 6 Cir., 116 F.2d 823, 835.

provision which permitted Fernseh to export into Farnsworth's territory. Fernseh demonstrated there could be no valid objection to this provision, for the export provisions granted no right to Fernseh which could apply to the United States; hence, as I see it, the provision had no practical importance. The Treasury Department recognized the export provision presented no problem; but on October 2, it nevertheless suggested "it might be wise" to clarify this with Fernseh. Farnsworth agreed. Such agreement or compliance constituted no modification of the June 14 contract. It was simply an explanation of it. At that October 2 conference, however, the Justice Department suggested there not be mutual assignments of patents but mutual free licenses. The record fails to disclose why the suggested arrangements would be more satisfactory. Yet, the government representatives, with Martin, actually drafted the cable Farnsworth should send to Fernseh regarding mutual free licenses. On the basis of the fact of Farnsworth submitting counter-proposals, the government argues Farnsworth considered that no contract had been effected on June 14.

The record shows Farnsworth attempted to make its position clear with the government it had no power to modify the June 14 contract. Farnsworth's Martin, on September 16, told the government officials:

"The present status of the transaction under consideration is that the offer made by Farnsworth has been accepted by Fernseh without reservation. A binding contract, therefore, appears already to exist and neither of the parties thereto has a right to alter the terms thereof.

"Unless, therefore, Fernseh were willing to renegotiate a new agreement, the terms of the instant agreement could not be altered. The past attitude of the Fernseh company, their reluctance in negotiating the present agreement and the difficulties encountered in the negotiations up to now indicate no reason for believing that Fernseh would be willing to alter the terms of the present agreement, as, for example, by eliminating the export provision. Moreover, Farnsworth has no real basis for requesting such a re-negotiation, and further-

more, the present aggravated war conditions and difficulties of communication render an attempt at such re-negotiation highly impractical, if not impossible." Clearly, therefore, Farnsworth's consent to submit the counter-proposals to Fernseh was not because it believed no contract existed on June 14 but, rather, because it was willing to get a modification of its terms as the price it must pay for a license. Despite Martin's consent to the government's proposals in an attempt to get modification from Fernseh, no action was taken. The fact is government officials waited until war with Germany had begun; and then denied the license, refusing permission to send the very cables the government itself had drafted. It is neither fair dealing nor equity for the government—as it would be in the case of any litigant—to have suggested if Farnsworth would obtain modification through the counter-proposals a license would be granted. Farnsworth's consent was, therefore, the price for the proposed license. The counter-proposals were drafted by the government. Action was delayed on them for a long time, at least until the outbreak of the war. It is not equity for defendant now to appear in court and urge Farnsworth's actions in this instance demonstrate the latter's acknowledgment that no contract existed on June 14. The statutes and Executive Orders in question were designed to protect American citizens and to hinder enemy aliens. Equity is shocked at a situation which would leave no right to Fernseh's patents in Farnsworth (American) while, admittedly, Fernseh (German) enjoys all rights in Farnsworth's (American) patents.

C. *Actions of Farnsworth's board of directors.* Defendant seeks to derive comfort from various meetings of Farnsworth's board of directors after June 14, 1941. The minutes of none of these meetings support any of defendant's contentions.

D. *Farnsworth's treatment of Fernseh's U. S. patents.* From June 14, 1941, Farnsworth at all times treated Fernseh's United States patents as belonging to Farnsworth. It did everything to protect its interest and title. No serious challenge is made to the facts on this phase of the case.

E. *Farnsworth's treatment of Farnsworth's European patents.* After June 14, 1941, Farnsworth acted on the assumption its European patents (those granted or applied for prior to September 1, 1939) had been assigned to Fernseh. In fact, it made no attempt to control those patents once assigned. Farnsworth never paid any fees or attempted to give instructions regarding them. However, defendant marshals one instance in support of a charge of inconsistent behavior. Defendant argues that on June 17, 1941, Farnsworth instructed Fernseh to abandon one patent that had been assigned. The writer of the letter which gave such instructions was, in fact, answering routine correspondence from Fernseh on several other matters. Nothing shows the writer was even aware of the assignment which had recently occurred between the parties.

Again, defendant argues Farnsworth failed to respond to a letter of May 20, 1946, regarding a Dutch patent assigned to Fernseh and to another letter of January 22, 1947, regarding certain Hungarian patents. Reference is also had to a letter of November 16, 1946, where Dutch patent attorneys stated they understood certain patents had been assigned to Fernseh, but were writing to Farnsworth, since they could not communicate with Fernseh and the patent stood in Farnsworth's name. From this, defendant argues, the Dutch attorneys were assuming Farnsworth still owned the patents. The evidence on this phase of the case is far from persuasive that the actions of the parties, as well as the actions of individual third parties, lend support to any view that no contract existed on June 14, 1941, Farnsworth vis-a-vis Fernseh.

### Actions of Fernseh

By letter of March 28, 1947, Reichel, Fernseh's patent attorney, stated: "In accordance with our cable of June, 1941, we are of the opinion that the European patents of Farnsworth were our property and that Fernseh's U. S. patents originated before September 1, 1939, are your property." Again, in 1949, Reichel wrote: "After conclusion of the agreement, i. e., after June 14, 1941, we (Fernseh) regarded our-selves as the undisputed owners of such of Farnsworth's European patents as were applied for before September 1, 1939. Applications filed after that date we treated as previously, i. e., in accordance with the agreement of 1937. We paid the annuities on the Farnsworth patents in Europe until 1945." There is evidence Fernseh paid all fees on Farnsworth's European patents. Defendant, nevertheless, attacks Reichel because his statements were solicited by Farnsworth. The critical fact for my determination is whether his statements are true. No evidence has been offered to show they are not. Evidence shows all his statements were not, in fact, solicited by Farnsworth. His 1947 statement was in response to a letter of Farnsworth. The 1949 declaration was given to an investigator of the Department of Justice upon request and a copy was sent to Farnsworth. Attempts to show other correspondence of Reichel as inconsistent, are without merit. This correspondence consists of inquiries by Reichel to other European patent attorneys in attempting to clarify his client's patent position. The fact is Farnsworth lent its aid by sending information in answer to all inquiries. None of the correspondence proves to me Farnsworth ever took the position there had been no assignment in June 1941.

Defendant's attempt to show Fernseh regarded its United States patents as its property after June 14, 1941, is not persuasive. Reference is made to a certain report submitted to the United States Military Government in Germany by Moller, of Fernseh, as of May 18, 1946. Nothing in the evidence of Fernseh's dealing with the United States Military Government in Germany shows Fernseh understood Farnsworth's European patents remained Farnsworth's and that Fernseh's United States patents remained Fernseh's. This particular evidence shows, if anything, the contrary. The evidence of Moller, who made the report to the United States Military Government, lends no aid to defendant's position. Moller went to Berlin and reviewed the entire situation between the parties. After reviewing all facts, he concluded: "However, I am convinced that the agreement of June 14, 1941,

in spite of this default (Farnsworth's failure to forward a formal assignment for recordation), is legal and Farnsworth has the rights resulting from the agreement." All the evidence shows Fernseh regarded the contract and assignment concluded as of June 14, 1941. Its actions thereafter are in accordance with this understanding.

5. My conclusions are that the terms of the correspondence between plaintiff and Fernseh and the provisions noted in the cable exchange are unambiguous and demonstrate, in view of the surrounding circumstances, a binding contract and assignment occurred on June 14, 1941. At the time of the vesting by the Custodian, Farnsworth was the owner and assignee of the patents, of contractual rights and equitable rights and interests in them; and plaintiff is entitled to the relief for which it prays. Farnsworth's motion for summary judgment should be granted and defendant's cross-motion denied.